IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BERNICE PECK, | ) | CASE NO.  5:21-CV-01231-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Bernice Peck ("Plaintiff" or "Peck"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.        PROCEDURAL HISTORY

In June 2019, Peck filed applications for POD, DIB, and SSI**,** alleging a disability onset date of June 10, 2019 and claiming she was disabled due to depression, fibromyalgia, sciatica, tendonitis, and arthritis. (Transcript ("Tr.") at 10, 132, 149, 168, 179.)  The applications were denied initially and upon reconsideration, and Peck requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 10.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On September 14, 2020, an ALJ held a hearing, during which Peck, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On November 6, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 10-32.)  The ALJ' s decision became final on May 14, 2021, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On June 22, 2021, Peck filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10, 12.)  Peck asserts the following assignment of error:

> (1)  The Administrative Law Judge's credibility analysis is not supported by substantial evidence.

(Doc. No. 10 at 8.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Peck was born in August 1974 and was 46 years-old at the time of her administrative hearing (Tr. 10, 30), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a limited education and is able to communicate in English.  (Tr. 30.)  She has past relevant work as an assistant manager, retail sales, welding-machine tender, and nurse assistant.  (*Id.*)

### B.     Relevant Medical Evidence[2]

On May 15, 2019, Peck saw Mark Pellegrino, M.D., for an initial pain management visit for her fibromyalgia.  (*Id.* at 381.)  Peck reported pain in multiple areas of her body and described the pain as constant, sharp, stabbing, burning, throbbing, and aching.  (*Id.*)  Nothing helped the pain, and everything made it worse.  (*Id.*)  Peck also complained of associated numbness, tingling, and weakness.  (*Id.*)  On

---

[2]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

examination, Dr. Pellegrino found slow, deliberate steps, normal balance, normal tandem walking, tenderness to palpation of the cervical spine but normal range of motion, tenderness to palpation of the lumbar spine but normal range of motion, and negative straight leg raise tests.  (*Id.*)  With respect to fibromyalgia, Dr. Pellegrino found 16 out of 18 tender points (9 bilateral pairs).  (*Id.* at 381-82.)  Dr. Pellegrino diagnosed Peck with fibromyalgia and widespread pain consistent with central pain syndrome and chronic pain syndrome.  (*Id.* at 382.)  Dr. Pellegrino recommended Lidocaine infusions, and suggested Peck consider medical marijuana.  (*Id.*)

On June 4, 2019, Peck underwent her first lidocaine infusion.  (*Id.* at 379-80.)  Before the infusion, Peck rated her pain as a 6/10.  (*Id.* at 379.)  After the infusion, Peck rated her pain level as a 3/10.  (*Id.*)

On June 7, 2019, Peck saw primary care provider Sandra Smith, CNP, for follow up of her anxiety, depression, and GERD.  (*Id.* at 359.)  Peck reported compliance with Lexapro, having a good support system, doing some resistive training, and walking two miles a day.  (*Id.*)  Peck told Smith Gabapentin was only partially effective in treating her leg pain, and that she was seeing Ohio Pain and Rehab for chronic pain of her low back, hands, elbows, fibromyalgia, and sciatica.  (*Id.*)  Peck reported lidocaine IV treatments were not effective.  (*Id.*)  Peck stated she had 10/10 right leg pain at night and physical therapy had not helped.  (*Id.*)  Smith found nothing abnormal on examination.  (*Id.* at 361-62.)  Smith continued Lexapro and noted Peck declined counseling.  (*Id.* at 362.)  Smith directed Peck to follow up with Ohio Pain and Rehab and continued Peck's Gabapentin.  (*Id.* at 363.)

On August 14, 2019, Peck underwent another lidocaine infusion.  (*Id.* at 377-78.)  Before the infusion, Peck rated her pain as a 10/10.  (*Id.* at 377.)  After the infusion, Peck rated her pain level as a 9/10.  (*Id.*)

On September 24, 2019, Peck underwent a psychological consultative evaluation with Bryan J. Krabbe, Psy.D.  (*Id.* at 383-89.)  Peck reported depression and severe fibromyalgia.  (*Id.* at 383.)  Peck

3

told Dr. Krabbe the highest grade she completed was seventh grade, and she had received special education services during school.  (*Id.* at 384.)  Peck reported three jobs during her lifetime, working as a factory laborer and assistant retail manager.  (*Id.* at 385.)  Peck stated she had been fired twice.  (*Id.*)  Peck reported difficulties learning previous jobs, as well as trouble staying focused, performing tasks in a timely manner, getting along with supervisors and coworkers, and managing work stress.  (*Id.*)  Peck described experiencing common symptoms of depression but did not describe any manic symptoms.  (*Id.*)  Peck reported trouble sleeping and that she spent her days laying in bed watching TV.  (*Id.*)  However, with questioning, Peck stated she took care of her daily hygiene, performed household chores, shopped for groceries, and prepared basic meals, although it took her longer because of pain and fatigue.  (*Id.*)  Peck struggled to remember appointments and medication and had minimal social contact outside of her family. (*Id.*)  Peck was able to drive.  (*Id.*)

On examination, Dr. Krabbe found adequate grooming and hygiene, adequate energy, normal speech, downcast facial expression, and tearful affect during the interview.  (*Id.* at 385-86.)  Peck recalled six digits forward and three digits backward and one out of three words after a brief delay.  (*Id.* at 386.)  Peck identified two of the past three Presidents but was unable to count backward from 100 by 7s or backwards from 20 by 3s.  (*Id.*)  Peck also struggled with division and fractions.  (*Id.*)  Dr. Krabbe determined that Peck's general level of intelligence appeared normal and thought that emotional factors may have interfered with her performance of certain tasks.  (*Id.*)  Dr. Krabbe opined Peck perfomed below average on certain cognitive tasks and that reported problems with learning in school "may lead to difficulties acquiring new information" in the workplace.  (*Id.* at 387-88.)  Dr. Krabbe further opined Peck's difficulty in performing serial 7s and 3s suggested difficulty maintaining attention and focus, but noted she displayed adequate task persistence during the evaluation, and she showed no sign of distraction during the interview.  (*Id.* at 388.)  Dr. Krabbe stated that Peck's reported history of problems with

4

teachers and classmates, as well as supervisors and coworkers, along with her reported mental health problems impacting work performance, "may lead to emotional instability when presented with critical supervisory feedback and difficulty developing and maintaining appropriate co-worker relationships." (*Id.*) Dr. Krabbe opined Peck's sad and tearful affect during the interview "may affect [her] level of engagement with co-workers and supervisors." (*Id.*) Dr. Krabbe further opined Peck's depression symptoms "may compromise her ability to respond to work pressures leading to increased emotional instability and withdraw [sic]." (*Id.*)

On September 25, 2019, Peck saw Smith for dry skin on her right foot and for medication refills. (*Id.* at 410.) Peck reported feeling fatigued, snoring, and not feeling rested in the morning, despite sleeping eight to ten hours a night. (*Id.* at 411.) Peck complained of increased depression and anxiety for the past several weeks despite being compliant with Lexapro, and she had lost her job. (*Id.*) Peck reported dry and itching skin on her right foot, which lotion was not helping. (*Id.*) Peck stated Gabapentin was not helping her leg pain. (*Id.*) On examination, Smith found mild right CVAT of the abdomen and a few erythematous fine papules on the right foot with dry and peeling skin. (*Id.* at 414.) Smith discontinued Lexapro and prescribed Wellbutrin to address Peck's depression and anxiety and ordered an iron panel and home sleep study to address Peck's fatigue and snoring. (*Id.* at 415.) Smith prescribed triamcinolone for Peck's foot and increased Peck's Gabapentin to 800mg four times a day. (*Id.* at 416-17.)

On November 20, 2019, Peck saw Dr. Pellegrino for follow up. (*Id.* at 432.) Peck reported no improvement with IV lidocaine therapy. (*Id.* at 433.) A physical examination revealed identical findings to Peck's May 2019 appointment. (*Id.* at 432-33.) In discussing further treatment options, Dr. Pellegrino noted Peck had registered for the medical marijuana program; although she had not yet purchased any

product, Peck intended to try this treatment option for her chronic pain "in the near future" and was to let Dr. Pellegrino know how she did with it.  (*Id.* at 433.)

On December 11, 2019, Peck saw Christopher Stalling, D.O., for evaluation of her bilateral hand pain.  (*Id.* at 437.)  Peck reported bilateral hand pain, right worse than left, that she described as aching, burning, sharp, and constant.  (*Id.* at 438.)  The pain radiated into her thumb and index, middle, and ring fingers.  (*Id.*)  Peck further reported numbness and tingling of these fingers, with the tingling worse at night, as well as weakness in her hands and dropping objects.  (*Id.*)  Peck told Dr. Stalling she had experienced this pain for more than five years, but it had gotten worse over the past several weeks.  (*Id.* at 438-39.)  On examination, Dr. Stallings found no significant thenar musculature atrophy, intact sensation, intact motor function, positive Durkin's compression test, positive Tinel sign at the carpal tunnel, and positive reverse Phalen's sign.  (*Id.* at 439.)  Dr. Stallings diagnosed Peck with bilateral carpal tunnel syndrome and ordered an EMG.  (*Id.*)

On January 8, 2020, Peck saw CNP Smith for follow up.  (*Id.* at 468.)  Peck reported feeling better and told Smith her previous crying episodes were "more related to her pain level" than her psychiatric medication.  (*Id.*)  Peck denied exercising.  (*Id.*)  Peck complained of continued dryness and itchiness of her right foot and continued leg and fibromyalgia pain, for which Gabapentin was not effective.  (*Id.*)  Peck reported Dr. Pellegrino suggested medical marijuana.  (*Id.*)  A physical examination revealed normal findings.  (*Id.* at 472.)

On January 15, 2020, Peck saw Karen Gade-Pulido, M.D., for an EMG study.  (*Id.* at 445.)  On examination, Dr. Gade-Pulido found normal strength in the upper extremities bilaterally, as well as normal bulk and tone, and positive carpal compression test at the wrists bilaterally.  (*Id.* at 445-46.)  The EMG study revealed moderately severe right median neuropathy at the wrist (carpal tunnel syndrome) and mild left median neuropathy at the wrist.  (*Id.* at 446.)

6

On January 23, 2020, Peck saw Dr. Stalling to discuss her EMG results.  (*Id.* at 440, 442.)  Dr. Stalling recommended right hand carpal tunnel release, and Peck agreed to proceed with the surgery.  (*Id.* at 442.)

On February 5, 2020, Peck underwent surgery for right hand carpal tunnel release.  (*Id.* at 512-13.)

On February 20, 2020, Peck saw Dr. Stalling for a two-week post-operative appointment.  (*Id.* at 457.)  Peck reported "feeling very well" and that her pain, numbness, and tingling were "much improved." (*Id.* at 458.)  Peck further reported her hand strength was returning.  (*Id.*)  Dr. Stalling discussed formal occupational therapy with Peck, but Peck preferred to do exercises on her own at home since she was doing well.  (*Id.* at 459.)  Peck also wanted to consider having the left side done in a month or so.  (*Id.*)

On July 1, 2020, Peck saw Marissa Ragon, CNP, for counseling.  (*Id.* at 478.)  Peck reported feeling more stable and denied depression, although she endorsed mild intermittent anxiety.  (*Id.*)  Peck told Ragon she was sleeping well, and her pain had been "dramatically reduced."  (*Id.*)  Peck denied PTSD symptoms but endorsed ADHD symptoms.  (*Id.*)  On examination, Ragon found appropriate dress and casual grooming, orientation in all spheres, normal alertness, good eye contact, normal speech with rapid rate and variable amplitude, cooperative, restless, and hyperactive behavior, logical thought processes and associations, unremarkable stream of thought, improved sleep, good appetite, anxious mood, good fund of knowledge, fair memory, fair concentration, good insight and judgment, and steady gait.  (*Id.* at 480.)  Peck's diagnoses consisted of major depressive disorder, recurrent, in partial remission, chronic post-traumatic stress disorder, insomnia due to other mental disorder, and attention-deficit disorder, combined type.  (*Id.* at 478.)

On July 29, 2020, Peck saw Ragon for follow up.  (*Id.* at 482.)  Peck reported mild improvement of her ADHD with her current level of Adderall, mild depression, and intermittent and fluctuating anxiety. (*Id.*)  Peck told Ragon she slept well and had a good appetite.  (*Id.*)  On examination, Ragon found

7

appropriate dress and casual grooming, orientation in all spheres, normal alertness, good eye contact, normal speech with normal rate and normal amplitude, cooperative and talkative behavior, logical thought processes and associations, unremarkable stream of thought, good sleep, good appetite, depressed mood, good fund of knowledge, good memory, good concentration, good insight, improving judgment, and steady gait. (*Id.* at 484.)

On August 26, 2020, Peck saw Ragon for follow up. (*Id.* at 486.) Peck reported "joy and shock" at the recent birth of her granddaughter. (*Id.*) Because of Peck's joy, she reported not feeling depressed, although she endorsed mild anxiety. (*Id.*) Peck told Ragon she slept well some nights but not others because her fibromyalgia pain affected her sleep. (*Id.*) Peck reported a good appetite and did not report any PTSD symptoms. (*Id.*) On examination, Ragon found appropriate dress and casual grooming, orientation in all spheres, normal alertness, good eye contact, normal speech with normal rate and normal amplitude, cooperative and calm behavior, logical thought processes and associations, unremarkable stream of thought, fluctuating sleep, good appetite, joyous and anxious mood, good fund of knowledge, good memory, good concentration, good insight and judgment, and steady gait. (*Id.* at 488.)

## C.  State Agency Reports

### 1.  Mental Impairments

On October 14, 2019, David Dietz, Ph.D., reviewed Peck's file and determined she had moderate limitations in her abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. (*Id.* at 140-41, 157-58.) Dr. Dietz further opined Peck could "perform SRT with 1-3 steps," "perform SRT without strict fast pace or high production requirements," could have brief, superficial interactions with others in the workplace, and would perform best in a reliable work environment that was free of frequent changes. (*Id.* at 144-46, 161-63.)

8

On February 11, 2020, on reconsideration, Vicki Warren, Ph.D., affirmed Dr. Dietz' findings.  (*Id.* at 172, 176-77, 183, 187-88.)

### 2.      Physical Impairments

On October 15, 2019, Gerald Klyop, M.D., reviewed Peck's file and opined she could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 142-44, 159-61.)  Dr. Klyop noted Peck's fibromyalgia pain had been considered in formulating the exertional requirements. (*Id.* at 143, 160.)  Peck could frequently climb ramps/stairs, stoop, kneel, and crouch.  (*Id.*)  She could occasionally climb ladders, ropes, or scaffolds and crawl.  (*Id.*)  Peck's ability to balance was unlimited. (*Id.*)

On February 18, 2020, on reconsideration, Diane Manos, M.D., affirmed Dr. Klyop's findings except she limited Peck to occasional fine and gross manipulation in the right hand.  (*Id.* at 174-75, 185-86.)

### D.    Hearing Testimony

During the September 14, 2020 hearing, Peck testified to the following:

- She lives with her 17-year-old son.  (*Id.* at 100.)  She has a driver's license.  (*Id.*)  She can read and write some English, although she has a lot of problems reading and writing.  (*Id.*)

- Her biggest issue preventing her from working is standing.  (*Id.* at 107.)  She has inflammation in her legs and back, and she also has arthritis.  (*Id.*)  She can stand for about five minutes before she needs to sit.  (*Id.*)  The arthritis and inflammation is different from her fibromyalgia.  (*Id.* at 108.)  She can walk more easily than she can stand.  (*Id.*)  If she has to stand, she leans on something.  (*Id.*)  She has never used a walker or cane.  (*Id.*)  She has trouble sitting.  (*Id.*)  She can sit for five to ten minutes before she "get[s] real fidgety" and needs to stand up.  (*Id.* at 108-09.)  She had changed position three times at that point in the hearing.  (*Id.* at 109.)  She elevates her feet above her waist five to six hours a day and sleeps with a pillow underneath her legs.  (*Id.*)

- Her fibromyalgia causes pain when she walks and bends. (*Id.* at 110.) The pain is constant and feels like little needles. (*Id.*) She experiences this pain 95% of the day. (*Id.*) She can experience that pain anywhere throughout her body, and it is worse if it is cold or raining. (*Id.*) She takes 800 milligrams of Gabapentin four times a day, and Nurse Smith just prescribed her 500 milligrams of Tylenol as well. (*Id.*) These medications ease her pain, but she still gets leg pain at night so badly that she will cry. (*Id.*) However, she is at the maximum dosage. (*Id.*) She tried to be more active but it "literally kills [her]." (*Id.* at 111.) It causes so much pain she physically cannot do it. (*Id.*) She did not undergo any physical therapy for her fibromyalgia. (*Id.* at 116.) Injections did not help her fibromyalgia pain. (*Id.*)

- She has not yet had carpal tunnel release surgery in her left hand. (*Id.* at 111.) The release surgery helped her right hand. (*Id.*) She has trouble gripping or holding things, and she drops things. (*Id.*) It is hard for her to brush her hair because of trying to lift her arm and her hand goes numb. (*Id.* at 112.) She cannot bend her thumb on her right hand, and it swells. (*Id.* at 117.) Those symptoms started after surgery. (*Id.*) She uses braces on both of her hands during the day. (*Id.* at 118.) She cannot hold a pen or pencil. (*Id.*) She can use buttons and zippers, but it hurts her hands, so she tries not to wear things with them. (*Id.*) She cannot peel potatoes or chop vegetables. (*Id.*)

- She has sciatica in both legs. (*Id.* at 112.)

- She spends most of her time in bed in her room. (*Id.*) She sleeps about three hours a night. (*Id.* at 114.) She can bathe and change her clothes. (*Id.*) She does not cook. (*Id.*) She can do laundry, but it takes her a couple of hours to do one load. (*Id.*) She can go to the store if she must. (*Id.*) She does not see people or go places on a regular basis. (*Id.*)

The VE testified Peck had past work as an assistant manager, retail sales, spot welder, and nurse assistant. (*Id.* at 124.) The ALJ then posed the following hypothetical question:

> I'd like you to presume an individual the same age, educational background and work experience as the claimant. I'd like you to presume the individual can perform the full range of light work, subject to the following limitations. Specifically, individual will be limited to frequent handling, or fingering bilaterally. The individual will be limited to occasional climbing of ramps or stairs, but would never climb ladders, ropes, or scaffolds. The individual would be limited to frequent stooping, kneeling or crouching, but only occasional crawling. The individual would be limited to performance of simple routine tasks, and simple work-related decisions. Will be limited to frequent interactions with supervisors, but only occasional interactions with coworkers, or the general public. The individual would tolerate few changes

10

in a routine work setting.  Could such an individual perform the past work of
the claimant?

(*Id.* at 124-25.)

The VE testified the hypothetical individual would not be able to perform Peck's past work as an assistant manager, retail sales, spot welder, and nurse assistant.  (*Id.* at 125.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as marker, routing clerk, and cleaner housekeeping.  (*Id.* at 125.)

The ALJ changed the exertional level to sedentary, and the VE testified the hypothetical individual could perform representative jobs in the economy, such as ink printer, wood dowel, and escort vehicle driver.  (*Id.* at 126-27.)

Peck's counsel asked the VE whether a sit/stand option calling for a change of position every five minutes would affect the VE's testimony.  (*Id.* at 128-29.)  The VE testified that would put a person off-task for more than six minutes, which would take away any time for the person to use the restroom and exceed the off-task threshold.  (*Id.* at 129.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

11

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Peck was insured on her alleged disability onset date, June 10, 2019, and remains insured through December 31, 2024, her date last insured ("DLI"). (Tr. 10-11.) Therefore, in order to be entitled to POD and DIB, Peck must establish a continuous twelve-month period of disability commencing

12

between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since June 10, 2019, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia, bilateral carpal tunnel syndrome (CTS), major depressive disorder, anxiety disorder, posttraumatic stress disorder (PTSD), and attention-deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except with the following additional limitations:
   - Can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; can frequently stoop, crouch, and kneel; but can only occasionally crawl;
   - Can frequently handle and frequently finger bilaterally; and
   - Is able to perform simple, routine tasks and to make simple work-related decisions; can have frequent interactions with supervisors, but only occasional interactions with coworkers and the general public; and can tolerate only few changes in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August **, 1974 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

13

8.    The claimant has a limited education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from June 10, 2019 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-32.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734,

2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her sole assignment of error, Peck asserts the ALJ's credibility assessment lacks substantial evidence.  (Doc. No. 10 at 8.)  Peck points to several examples of record evidence in support of her argument: (1) Peck underwent several treatments for her chronic pain before beginning pain management with Dr. Pelligrino; (2) at the hearing, Peck testified she was taking 500 milligrams of Tylenol in addition to Gabapentin for her pain; (3) as Peck treated with Dr. Pellegrino and CNP Smith in 2019, the ALJ's statement that Peck had "not sought any 'other treatment' over the past two years" was inconsistent with the record; and (4) the ALJ's assertion that Peck had not returned to Dr. Pellegrino and had not been pursuing treatments including medical marijuana, physical therapy, or exercise was not supported by substantial evidence.  (*Id.* at 10-11.)  In addition, Peck argues the ALJ's reliance on Dr. Pellegrino's "'normal' examination findings are misplaced as it relates to [Peck's] allegations of pain caused by fibromyalgia."  (*Id.* at 11.)  Peck also asserts it was "unfair for the ALJ to use her "commendable work history against her" in the credibility analysis.  (*Id.* at 12.)  Finally, Peck argues the ALJ's statements regarding Peck's activities of daily living cannot support the ALJ's adverse credibility finding.  (*Id.* at 12-13.)

The Commissioner responds that substantial evidence supports the ALJ's physical RFC determination and the ALJ's subjective symptom evaluation.  (Doc. No. 12 at 6-16.)  With respect to Peck's suggestion that the ALJ should have asked her questions to make sure she had not followed up with treatment, the Commissioner argues that Peck bears the burden to present evidence that she was disabled.  (*Id.* at 10.)  Furthermore, the Commissioner asserts Peck fails to point to any specific limitation

16

which she claims was caused by fibromyalgia and which the ALJ ignored, nor has she presented medical or other evidence showing her fibromyalgia caused limitations beyond those incorporated into the RFC. (*Id.*)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the September 14, 2020 hearing.

[4] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[5] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Peck's testimony and other statements regarding her symptoms and limitations. (Tr. 19-20.) The ALJ determined Peck's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.* at 20.) However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*) Specifically, the ALJ found as follows:

> In terms of the alleged fibromyalgia, the February 22, 2019 office note from
> primary care nurse practitioner Sandra Smith, A.P.R.N., C.N.P., reports a past

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

18

medical history of chronic pain reportedly diagnosed as fibromyalgia, with current pain specifically in her low back, elbows, hands, and legs (Ex. 2F/8). Nurse Practitioner Smith recounted that Ms. Peck was already prescribed to take 800mg gabapentin three times per day but was requesting a referral to a pain management specialist.

On May 15, 2019, Ms. Peck attended a consult with Mark Pellegrino, M.D., for fibromyalgia pain in multiple areas of the body, currently rated as 10/10 in intensity, and present for several years (Ex. 3F/4). Dr. Pellegrino recorded 16 positive tender points on digital palpation to the 18 specific locations of the body for fibromyalgia, as well as tenderness to palpation along the axial skeletal spine (cervical, thoracic, and lumbar regions) (Ex. 3F/5). He also observed that she walked with slow, deliberate steps. The pain specialist diagnosed fibromyalgia with widespread pain and recommended intravenous lidocaine therapy as treatment, along with continued use of the previously prescribed gabapentin.

Partially consistent with the testimony, Dr. Pellegrino administered two lidocaine injections on June 4, 2019 and on August 14, 2019, which provided some initial benefit but ultimately lost efficacy over the next months (Ex. 3F/3,1; and see Ex. 4E; 2F/1; but see Ex. 5F/2; 7F/1; 11F/9). Her primary care practitioner notably increased the daily dosage of gabapentin to four times per day as of September 2019 (Ex. 5F/8). Dr. Pellegrino indicated in November 2019 follow-up that, based on the failed IV lidocaine and continued clinical demonstration of fibromyalgia via tender points and axial skeletal pain, the claimant should entertain registering for the State's medical marijuana program (Ex. 7F/2-3).

These findings and aspects of treatment relating to fibromyalgia are partially consistent with the alleged persistence of chronic pain throughout the body and some limiting effects on postural movements of the body and on how much weight she can comfortably lift and carry. However, the balance of Dr. Pellegrino's objective medical signs from the two (and only two) office visits in May 2019 and November 2019, statements Ms. Peck made to her primary care nurse practitioner regarding partial effectiveness of the gabapentin medication in reducing the intensity of fibromyalgia pain, and no other treatment(s) sought for pain over the past two years are not fully consistent with the extent of alleged intensity and functionally limiting effects of pain especially on her abilities to stand, to sit, and to walk for even very short continuous periods and generally needing to spend most of a typical day lying in bed.

With no musculoskeletal examinations done by the primary care practitioner, Dr. Pellegrino found on his two office examinations normal mobility and coordination, normal balance and tandem walking, normal joint ranges of motion throughout, normal strength in all major muscle groups tested, normal range of motion throughout the cervical and thoracolumbar segments of the spinal column, and negative straight-leg raising test in the bilateral lower extremities (Ex. 3F/5; 7F/1-2). These medical signs are not consistent with pain so intense as to limit standing, walking, and sitting abilities or to prevent performance of frequent postural positionings, other than climbing.

Furthermore, Ms. Peck has not returned to Dr. Pellegrino over the current year, which could be related to opting instead to see an orthopedic hand surgeon for later worsening symptoms of CTS (discussed next). Not only does this convey that she has only been managing the fibromyalgia pain with continued use of gabapentin medication, but she has also not been pursuing non- medication treatments including the indicated medical marijuana program per the pain specialist or, through the date of the hearing, any physical therapy program. She was recommended to engage in exercise by her primary care practitioner (Ex. 11F/16).

Even with using the gabapentin only, she has conveyed to Nurse Practitioner Smith that the gabapentin is partially effective for managing the fibromyalgia, and she rated the intensity of pain as 4/10 in an April 2020 follow-up (via telephone) (Ex. 11F/2; and see Ex. 2F/8,1). She also reported sleeping eight to 10 hours a night, and most of the treatment notes in September 2019, January 2020, and April 2020 reflect primary complaints of dry and itchy skin at the right foot—i.e., an unrelated and relatively minor ailment compared to the testimony regarding the alleged intensity of fibromyalgia pain (Ex. 6F/2; 11F/9,2).

Lastly, a July 2020 progress note from the claimant's psychiatrist contains her reports that her pain had "dramatically reduced" and that she sleeps well, and it records an observation of a steady gait (Ex. 12F/3,5). Noting herein that she testified about her primary care practitioner having added Tylenol 500mg to the ongoing prescription for gabapentin, the undersigned cannot find the claimant's testimony and previous written descriptions about fibromyalgia and associated pain to be more than partially consistent with the foregoing medical evidence relating to normal medical signs for strength and mobility of the four extremities and for normal range of motion at the entire spinal column, the clinical observations for steady and unassisted gait and normal balance and coordination, and the claimant's statements about partially effective treatment through medication(s) alone. The medical evidence relative to fibromyalgia does not support the alleged limitations in standing, sitting, or walking abilities or the full extent of extreme functional loss in relation to lifting or carrying no heavier than five to 10 pounds. The evidence supports the

20

physical abilities to lift, carry, push, or pull 10 pounds frequently and up to 20 pounds occasionally; to occasionally climb ramps and stairs and to frequently stoop, crouch, and kneel; and no limitations in the abilities to sit, stand, or walk each for about six total hours of an eight-hour workday. The only work-related ability that would be precluded by fibromyalgia is climbing ladders or ropes or scaffolding.

(*Id.* at 20-23.)

Later in the RFC analysis, the ALJ further found as follows:

Ms. Peck has a generally present and good work history, with especially notable continuity of work activity and wages reported over years 1999 through 2019 (see generally Ex. 3D). Such work history includes a job that she maintained for over 11 years, which cuts against the portrayal to the examining psychologist regarding work-related problems in interacting with others, concentrating on and completing tasks, and handling stresses and pressures (Ex. 4F/3).

The claimant has not alleged or reported to her medical sources having experienced any adverse side effects from the use of the medications prescribed to manage fibromyalgia pain and symptoms of depression and anxiety (Ex. 3E/8; 6E/5; 12F/6,10,14).

In terms of her daily activities, Ms. Peck has reported some limitations in physical abilities to shop in stores without leaning onto the store-provided cart, to do laundry chores and to perform household cleaning tasks but slowly and with rest breaks in between, and to drive to her medical appointments, to stores, and to her teenage son's destinations as necessary (Ex. 4E: 3E/1,3-4,6). She testified that she no longer cooks and spends the majority of a typical day lying in bed, mostly due to fibromyalgia-related pain and alleged impact on sitting, standing, and walking abilities but also partly due to depression.

Although the claimant has described daily activities that are rather extremely limited, two general factors weigh against considering these allegations to be strong evidence in favor of any greater limitations in work-related abilities beyond those supported by the preceding analysis of the medical evidence. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, even if the claimant's daily activities are truly as limited as described in written reports and testimony associated with these applications, it is difficult to attribute that degree of limitation to her medical and psychological conditions, as opposed to other reasons, in view of the improving medical signs from her psychiatrist, the conservative nature of treatment offered for fibromyalgia pain with no dedicated treatment for that impairment since the brief course of pain management with Dr.

Pellegrino, and other factors discussed above. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this Finding.

Based on the foregoing analysis, the undersigned concludes that the claimant's statements about the intensity, persistence, and functionally limiting effects of pain and other symptoms are only partially consistent with the medical evidence and other evidence in the record, to the extent reflected in this Finding of residual functional capacity for a range of light work. Neither the objective findings from her medical sources nor other factors relating to fibromyalgia and bilateral CTS support only occasional abilities to handle and to finger during a workday, a need to alternate between standing and sitting positions at any time between normally scheduled rest breaks of a workday (about once every two hours) or to the contended frequency of once every five minutes, or an inability to perform more than sedentary exertion work. The totality of the medical evidence and these other relevant evidentiary factors do not support a conclusion that the claimant's pain, emotional symptoms, and numbness/tingling in her hands have been so intense and persistent despite medical treatments that they would combine to cause her to be frequently off task (unable to maintain concentration and persist at work) during a workday and/or to be repeatedly absent from a job within the parameters of this range of light exertion work.

(*Id.* at 25-26.)

The Court finds substantial evidence supports the ALJ's assessment of Peck's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Peck's allegations of disabling conditions. (*Id.* at 20-26.) Contrary to Peck's allegations, the ALJ credited some of Peck's subjective symptoms but did not accept them to the extent alleged by Peck because of findings on examinations, her own statements, and lack of treatment, all factors to be considered under the regulations. (*Id.*)

With respect to Dr. Pellegrino's findings, while the Court understands Peck's concerns regarding the focus on normal objective medical signs separate from Dr. Pellegrino's fibromyalgia findings, the fact remains that the ALJ tracked Dr. Pellegrino's treatment notes in setting forth not just the fibromyalgia findings but also the other examination findings. (*Cf. id.* at 20-21; 381-82, 432-33.) Furthermore, the ALJ

22

recognized Peck's fibromyalgia and found it to be a severe impairment.  *Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19 CV 2844, 2020 WL 7769729, at *12 (N.D. Ohio Dec. 30, 2020).  But "'disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it.'"  *Id.* (quoting *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014)).  As the court explained in *Van Pelt*:

> The claimant in a Social Security case bears the burden of demonstrating the need for a more restrictive RFC. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). Here, Plaintiff has not pointed to any physician offering any specific limitation based on fibromyalgia, nor does she articulate any specific limitation – stemming from these diagnoses or otherwise – that she contends should have been included in the RFC. The ALJ's opinion makes clear he considered the medical opinions, and other evidence, in the record and came to his own conclusion regarding Plaintiff's RFC, precisely as the regulations require.  *See* 20 C.F.R. § 416.946(c).

*Id.*  The same is true here.  Peck fails to identify any physician's opinion showing specific limitations stemming from her fibromyalgia, nor does she assert any specific limitation that should have been included in the RFC as a result of her fibromyalgia.  (Doc. No. 10.)  Finally, Peck does not challenge the ALJ's finding that the opinions of the state reviewing physicians were mostly persuasive (*id.*), and as the ALJ recognized, those physicians explicitly considered Peck's fibromyalgia pain in their review.  (*Id.* at 27, 143, 160, 174, 185.)

In addition, while Peck argues the ALJ erred in stating that she had not sought pain management treatment over the past two years, just a few paragraphs later the ALJ stated Peck had not returned to Dr. Pellegrino over the current year.  (*Id.* at 21.)  Peck fails to cite any evidence that she returned to Dr. Pellegrino after November 2019.  (Doc. No. 10.)

With respect to Peck's argument regarding her work history, it is clear the ALJ only used her work history to discredit Peck's claims regarding her ability to concentrate, interact with others, and handle work stress.  (Tr. 25.)

23

Regarding Peck's daily activities, the ALJ correctly stated that there can be no objective verification of the level of a person's activities of daily living.  (*Id.* at 26.)  However, the ALJ went on to state that even taking Peck's testimony about her daily activities at face value, her statements were contradicted by other evidence in the record.  (*Id.*)  Again, while the Court agrees the ALJ's use of the phrase "conservative course of treatment" with respect to fibromyalgia is concerning, the ALJ went on in that same sentence to accurately state that Peck had not pursued any "dedicated treatment for that impairment since the brief course of pain management with Dr. Pellegrino."  (*Id.*)  To the extent Peck claims the ALJ should have asked her about whether she pursued medical marijuana treatment, the fact remains that Peck bore the burden of showing she was disabled.

"In short, although Plaintiff can point to evidence in the record in support of her general contention that she is more limited, the Court finds that the ALJ applied the appropriate legal standards[,] and his conclusion is supported by substantial evidence."  *Van Pelt*, 2020 WL 7769729, at *13.

### VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: April 28, 2022                                   *s/ Jonathan Greenberg*
                                                       Jonathan D. Greenberg
                                                       United States Magistrate Judge